## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

VIRGINIA GALLAHER, )
                  Plaintiff, )
                         )     CIVIL ACTION NO. 03:05-460
v. )
                         )
HARTFORD LIFE & ACCIDENT )    JUDGE KIM R. GIBSON
INSURANCE COMPANY, )
                Defendant. )

## MEMORANDUM OPINION & ORDER OF COURT

**GIBSON, J.**

Now before the Court is Defendant's Motion for Summary Judgment (Document No. 16), Plaintiff's Opposition thereto (Document No. 19), and Defendant's Reply (Document No. 21). Plaintiff Virginia Gallaher (hereinafter "Gallaher" or "Plaintiff") filed her Complaint on December 21, 2005, alleging violations of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et. seq* (hereinafter "ERISA"), against Hartford Life and Accident Insurance Co. (hereinafter "Hartford" or "Defendant").[1] Gallaher claims that Defendant wrongfully denied her disability benefits to which she was entitled as a former employee of JLG Industries, Inc. (hereinafter "JLG"). Defendant now seeks summary judgment, arguing that its denial of Plaintiff's benefits was not arbitrary and capricious because the evidence supporting her claim established that she was no longer disabled under the applicable definition. For the reasons that follow, the Court agrees and shall grant the motion.

---

[1] Throughout this case, Hartford has been incorrectly identified in the caption as Hartford Life Insurance Company. The Court now *sua sponte* corrects that misnomer. FED. R. CIV. P. 15(c)(3).

1

## I. BACKGROUND[2] AND PROCEDURAL POSTURE

JLG, a Pennsylvania corporation, hired Plaintiff as a Material Operator on April 20, 1998. As

a JLG employee, Gallaher participated in the group Long Term Disability Plan (hereinafter "the Plan"),

which Hartford insured. The Plan defines disability as follows:

[D]uring the Elimination Period and for the next 24 months you are prevented by (1)
accidental bodily injury; (2) sickness; (3) Mental Illness; (4) Substance Abuse; or (5)
pregnancy, from performing one or more of the Essential Duties of Your Occupation,
and as a result your Current Monthly Earnings are no more than 80% of your Indexed
Pre-disability Earnings. After that, you must be prevented from performing one or
more of the Essential Duties of Any Occupation.

The Plan further provides Hartford with "full discretion and authority to determine the eligibility for

benefits and to continue and interpret all terms and provisions" of the Plan. Additionally, the Plan

requires that "[a]ll proof [of loss] submitted must be satisfactory to [Hartford]."

In 1999, Gallaher visited Douglas Tice, M.D., complaining of a pain in her right knee. On July

16 of that year, Dr. Tice performed arthroscopic surgery on that knee and diagnosed Gallaher with a

grade III chondromalacia medical femoral condyle and diffuse synovitis. Gallaher returned to work in

August 1999.

Sometime thereafter, Plaintiff began performing duties at JLG that required greater stooping and

squatting, and that caused pain along the medial joint line of her right knee. Gallaher thus visited Dr.

---

[2] The factual history recounted in this opinion is based upon the Parties' Statements of Material Facts,
submitted pursuant to Local Rule 56.1, as well as any objections and counter-statements thereto. Although no
indentations or marks are used, the Court has, where appropriate, directly quoted the language of the Parties. Any fact
not present here has been deemed by the Court to be immaterial, lacking adequate evidentiary support, disputed for
purposes of the present motion, or argumentative and not factual. Additionally, the non-moving party concedes
anything in the movant's Statement of Material Facts to which the non-moving party does not directly respond. L.R.
56.1(E). Some facts may not be in the same form as submitted because the Court has concluded that the record did not
support the fact as proposed. Where appropriate, the Court has supplemented these facts with citation to the evidentiary
record.

2

Tice on June 8, 2000, again complaining of discomfort in her right knee. Dr. Tice performed an MRI on that joint on June 12, 2000, a second arthroscopic surgery on July 7, 2000, and diagnosed Gallaher with a grade II/IV chondromalacia medical femoral condyle. During a follow-up visit on August 10, 2000, Gallaher complained to Dr. Tice of pain in her left knee and was referred to Dr. Thomas J. Ellis, D.O., for an orthopedic evaluation. Upon subsequent examination, Dr. Ellis stated that Plaintiff was limited with respect to prolonged standing, but could perform work of a more sedentary variety. On September 19, 2000, Dr. Tice recommended a possible mosaicplasty and, eight days later, authorized Gallaher's conditional return to work, imposing a restriction that she perform sedentary duties only. Plaintiff underwent another arthroscopic surgery on her right knee sometime in early 2001.

Gallaher received short-term disability benefits from July 14, 2000, through October 12, 2000, and completed an application for long-term disability benefits in October 2000. In support of that application, JLG completed a statement that described the physical duties of her position, according to which she was required to stand constantly and frequently walk, stoop, kneel, and crouch. This was apparently sufficient to establish that Gallaher was disabled from her own occupation, and Hartford approved the application for long-term benefits on November 20, 2000.

In the meantime, Gallaher's continuing left-knee pain led to an MRI on October 30, 2000, which revealed suspicion of a partial interstitial tear of the anterior cruciate ligament (hereinafter "ACL"), grade II chondromalacia, weight bearing portion of medial femoral condyle and grade II meniscal tear, and posterior horn of medial meniscus without communication to articular surface. Dr. Tice performed arthroscopic surgery on that knee in April 2001, finding an area of grade II/III chondromalacia of the medial femoral condyle, which he treated with chondroplasty. The surgery also revealed, however, an

3

intact ACL and no meniscal tear. After examining the joint in April and May 2001, Dr. Tice reported that Plaintiff's left knee was healing well.

On November 27, 2001, David R. Cooper, M.D., an orthopedic surgeon, acting in relation to Plaintiff's claim for workers' compensation, independently evaluated Gallaher's medical condition. Dr. Cooper reported that x-rays did not suggest any necessity for drastic medical treatment and opined that knee-replacement surgery might only lead to greater medical complications. Cooper suggested that Plaintiff's subjective complaints of pain and disability were correlated to an addiction to narcotics, but noted that if those complaints are true, "they are due to underlying degenerative changes" and that Gallaher "does have a degree of atrophy to the right leg as one would expect from all of her surgeries." Cooper also indicated that even if Plaintiff's subjective complaints were true, she was still capable of performing light-duty work.

Despite Cooper's reservations, on November 30, 2001, Gallaher underwent a partial right knee replacement under the care of Joshua Port, M.D. Dr. Port concluded at the time that Gallaher "could engage in sedentary work, although I don't think she should repetitively lift nor carry. I think she should be mainly seated. A mainly seated paperwork type position would be ideal for her."

On March 1, 2002, Plaintiff's primary care physician, Henry Shoenthal, M.D., referred Gallaher to the Joyner Sports Medicine Institute (hereinafter "JSMI") because of low back and right hip pain. Plaintiff also complained of tingling in her right toes, pain with prolonged standing or sitting, tenderness along her right side, a limited range of motion in her back, and decreased sensitivity of her right knee. At that time, Gallaher reported that she was no longer employed. An MRI of Plaintiff's lumbosacral spine performed on March 12, 2002, revealed some physical abnormalities. Sometime thereafter, Dr.

4

Shoenthal also referred Plaintiff to the pain clinic at Conemaugh Hospital. Document No. 18-3, p. 16.

Because she first began receiving long-term benefits in October 2000, Gallaher's two-year Elimination Period, after which her eligibility for those benefits would depend on an inability to perform any occupation instead of just her own, was set to end in October 2002. Through letters dated April 22, 2002, and July 26, 2002, Hartford notified Gallaher that, as of October 12, 2002, she must meet this more stringent definition of disabled in order to continue receiving long-term benefits. In August 2002, Hartford conducted an Employability Analysis Report (hereinafter "EAR") of Gallaher's capabilities, wherein it cited a Physician's Statement of Continuing Disability and Physical Capabilities Form (hereinafter "PSCD/PCF") that Dr. Shoenthal signed in May 2002. The May 2002 PSCD/PCF apparently concluded that Gallaher was subject to the following limitations: "Sit/Drive: 6 hours; Stand/Walk: 3 hours; Lift up to 10 lbs; climbing, balancing, stooping, kneeling, crouching, crawling **Occasional**; reaching, handling, fingering: **Frequent**; Talking, hearing, tasting, etc: **Constant** as A.P. did not place any restrictions in these areas." Document No. 19-2, p. 1. In its EAR, Hartford cross-referenced these limitations against a database of job descriptions and concluded that "Ms. Gallaher has severely limited functional capacities at this time. The occupations identified [in the database] do not show substantial growth in the national economy and therefore cannot be considered for a job-person match." *Id.* Accordingly, in a letter dated September 17, 2002, Defendant reported that Gallaher met the broader policy definition of disability, would continue to qualify for long-term benefits, but would periodically have to provide proof of continued disability.

In response to subsequent records requests, Hartford received from Plaintiff a second PSCD/PCF from Dr. Shoenthal dated September 8, 2004. This report was based on a physical examination of

5

Plaintiff and concluded that Gallaher's ability to lift, carry, push, or pull was limited to ten pounds; that Gallaher was unable to climb, balance, stoop, kneel, crouch, or crawl; that she could only occasionally reach above her shoulders or below her waist, handle, finger, or feel; that she could not repetitively use either foot; and that her performance of certain activities was limited to the following extent:

| Activity | # Hours at a Time | Total # Hours/Day | In 8 hour workday |
|----------|-------------------|-------------------|-------------------|
| Sit | 1 | 1 | 1 |
| Stand | less than 1 | less than 1 | less than 1 |
| Walk | less than 1 | less than 1 | less than 1 |
| Drive | 2 | 2 | 2 |

Document No. 18-5, pp. 13-14. Dr. Shoenthal also found that Plaintiff did not require any environmental restrictions, but that her physical restrictions were not likely to improve. *Id.* at 14.

At some unknown time, Defendant also received a physical evaluation report dated April 11, 2003, from Dr. Beverly Epstein, a physician with the pain clinic to which Dr. Shoenthal referred Plaintiff (hereinafter "the Epstein Report"). Document No. 18-4, p. 2. Although often illegible, the Epstein Report indicates that Dr. Epstein conducted a "normal neurological examination" and concluded that Plaintiff "should be able to do a desk job, even if she has chronic pain, she can still walk." Document No. 18-3, p. 17. The Epstein Report also lists various physical limitations, but concludes that Gallaher "is independent in activities of daily living, she should just not do a job that requires heavy lifting." *Id.* at 24.

In 2005, Defendant commissioned Medical Advisory Group, LLC (hereinafter "MAG") to review Gallaher's medical file and render an opinion as to the extent of her disability. Dr. Harvey A. Popovich, M.D., board-certified in occupational and environmental medicine, family practice, and as an independent medical examiner, performed the review. Dr. Popovich apparently consulted with Dr.

6

Shoenthal and sent Hartford his Medical Report on February 10, 2005 (hereinafter "the Popovich

Report"). As evidence of his conversation with Dr. Shoenthal, Dr. Popovich attached to the report a

fax dated February 9, 2005, in which he wrote Dr. Shoenthal the following:

> You stated that Ms. Gallaher had chronic aches and pains particularly involving her
> back, legs and knees. You stated that she also had migraine headaches but did not
> require any restrictions on that basis. You indicated that in your opinion Ms.
> Gallaher was capable of working in a mainly sedentary capacity with the restriction
> that she lift no more than 10 pounds. You did not identify any specific objective
> physical examination findings indicative of an inability on the part of Ms. Gallaher
> to function at this level.
>
> Please make any corrections or additions to this summary that you find necessary.
> If I do not hear from you within five business days via fax . . . I will assume that I
> have accurately summarized our conversation.

Document No. 18-5, p. 8. Taking into consideration his conversation with Dr. Shoenthal and his

extensive review of Gallaher's medical history, Dr. Popovich concluded that Plaintiff was "currently

capable of returning to work on a full-time basis . . . . in a mainly sedentary capacity with the

restrictions that she not lift, push or pull more than 10 pounds and have the ability to change positions

as necessary for comfort." Dr. Popovich found no "limitations . . . with respect to the upper extremities

or the spine," and disagreed with Dr. Shoenthal that there was any "limitation with respect to the

number of hours that Ms. Gallaher is capable of working per day or a limitation with respect to

repetitive use of her feet in a sedentary circumstance." *Id.* at 5, 6.

Largely on the basis of the Popovich Report and Dr. Popovich's summary of his conversation

with Dr. Shoenthal, Hartford conducted another EAR and identified at least four occupations that

Plaintiff could perform: telephone solicitor, napper tender, hander-in, and suture winder. Pursuant to

this finding, Defendant informed Gallaher on February 25, 2005, that she no longer met the policy

7

definition of disabled. and that her long-term benefits would be discontinued on February 28, 2005.

Gallaher appealed that decision in July 2005 and included in her supporting materials the

transcript from a deposition taken of Dr. Shoenthal on July 6, 2005. Document No. 18-3, pp. 2-10, 26-

40. Under questioning from Plaintiff's attorney, Dr. Shoenthal described Gallaher's capabilities:

> **A:** Sedentary work could be carried out based on the fact that she's not to lift more
> than ten pounds. Sedentary work on the other hand would be hard to be carried out
> because of the continuing pain while sitting. She could not sit more than an hour at
> a time. . . .
> **Q:** Okay. Even when she was doing any of these work—would she have pain either
> sitting, standing, bending anything like that even if she was allowed to have breaks
> by her employer?
> **A:** Yes, pain would continue.
> . . . .
> **Q:** As for standing and walking, what would be your opinion even with normal
> breaks for an eight hours, how long could she stand or walk within a normal job in
> the normal course of actual employment?
> **A:** One hour or less for each.
> **Q:** Would you also limit her as to any pushing, pulling type of activity?
> **A:** The same ten pound limit.

*Id.* at 2-4. During the deposition, Dr. Shoenthal also reviewed the Epstein Report:

> **Q:** Would you agree with the opinions contained in there except as to the weight
> restrictions?
> **A:** Yes.
> **Q:** Dr. Epstein at that time had opined that [Gallaher] had the ability to lift 20
> pounds, that was in 2003, would you further restrict that presently?
> **A:** I would restrict it to ten pounds . . . .

*Id.* at 5-6.

To help decide Gallaher's appeal, Hartford retained Hyman Glick, M.D., a board-certified

orthopedic surgeon, to review Plaintiff's medical records and appeals materials. In a report dated

September 21, 2005 (hereinafter "the Glick Report"), Glick concluded that "[w]hile [Gallaher] does

8

have some evidence of one level degenerative lumbar disc disease, the objective medical data do not preclude full gainful employment. Based upon [her] medical records, she is not precluded from full-time work in a modified, primarily seated sedentary position." Hartford therefore denied Plaintiff's appeal on September 22, 2005. Acting pursuant to 29 U.S.C. § 1132(a)(1)(B), Gallaher then filed the action *sub judice* on December 21, 2005, alleging that Defendant

> has unreasonably and without justification refused to pay Plaintiff any portion of the disability benefits due on [the Policy]. . . . has ignored [medical records] of Plaintiff's continuing disability . . . . [and], by unilaterally stopping payments under such policy without affording Plaintiff as opportunity for hearing or opportunity for challenge of such determination, has deprived Plaintiff of benefits to which she is entitled without due process of law.

Document No. 1, ¶ 21. Plaintiff seeks the retroactive reinstatement of her long-term disability benefits; an injunction prohibiting future suspension of those benefits; attorney's fees, costs, and prejudgment interest; and such other relief that the Court deems appropriate. *Id.* at ¶¶ 19, 21.

## II. STANDARDS

### A. FED. R. CIV. P. 56

Summary judgment is appropriate where "there is no genuine issue as to any material fact." FED. R. CIV. P. 56. "An issue of material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (citation omitted). Material factual disputes are those "that might affect the outcome of the suit under governing law." *Id.* On a motion for summary judgment, the moving party must first "identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate

the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). To defeat the motion, "an adverse party may not rest upon the mere allegations or denials of his pleading." *Id.* at 321 n.3. Instead, it must use evidence to "set forth specific facts showing that there is a genuine issue for trial." *Id.*

"In deciding whether summary judgment is warranted, the District Court may not weigh the evidence or make credibility determinations." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 124 (3d Cir. 1999). Instead, "'inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true.'" *Carter v. Exxon Co. USA*, 177 F.3d 197, 202 (3d Cir. 1999) (quoting *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992)). The Court need not, however, "turn a blind eye" if Gallaher's evidence lacks sufficient probative force. *Thomas v. Bd. of Educ.*, 467 F. Supp. 2d 483, 486-87 (W.D. Pa. 2006) (citing *Big Apple BMW, Inc.*, 974 F.2d at 1362). Moreover, the Court "must look to the evidence as a whole and consider any single piece of evidence in the context of other evidence." *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 369 (3d Cir. 2004).

### B. ERISA

"[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989). Because the Parties agree that Hartford, as the plan administrator, possessed the discretion to determine eligibility for benefits, Defendant's decision to deny Gallaher long-term disability payments violates ERISA only if it was arbitrary and capricious.

*Smathers v. Multi-Tool, Inc.*, 298 F.3d 191, 194 (3d Cir. 2002). The burden is therefore on Gallaher to show that the denial of benefits was "'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Pinto v. Reliance Std. Life Ins. Co.*, 214 F.3d 377, 393 (3d Cir. 2000) (quoting *Abnathya v. Hoffman-LaRoche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993)). "[T]he court must defer to the administrator of an employee benefit plan unless the administrator's decision is clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan." *Abnathya*, 2 F.3d at 41.

However, when an insurance company both funds a benefits plan and possesses the discretion to determine eligibility under the terms of that plan, as is the case here, courts must take into account the possible conflict of interest by applying a heightened level of scrutiny according to a sliding scale. This approach "intensif[ies] the degree of scrutiny to match the degree of conflict, considering, among other factors, the exact nature of the financial arrangement between the insurer and the company." *McLeod v. Hartford Life & Accident Ins. Co.*, 372 F.3d 618, 623 (3d Cir. 2004). Other relevant considerations include "the sophistication of the parties, the information accessible to the parties, and .... the current status of the fiduciary." *Pinto*, 214 F.3d at 392 "[T]he less evidence there is of conflict on the part of the administrator, the more deferential the standard becomes." *McLeod*, 372 F.3d at 623.

## III. ANALYSIS

### A. The Standard of Review in this Case

Hartford concedes its dual role in both funding and administering the Plan. Document No. 17, p. 13. Because of this structural conflict, the Court agrees with the Parties that it must begin "at the mild end of the heightened arbitrary and capricious scale." *McLeod v. Hartford Life & Accident Ins.*

11

*Co.*, 372 F.3d 618, 624 & n.3 (3d Cir. 2004) (applying the heightened arbitrary and capricious standard solely on the basis of Defendant's concession that it funded and administered the relevant insurance plan); *see also Lasser v. Reliance Std. Life Ins. Co.*, 344 F.3d 381 (3d Cir. 2003). The extent of any further heightening is then determined by relative sophistication levels, accessibility of information, and the fiduciary's current status, among other factors. *Lasser*, 344 F.3d 381 (3d Cir. 2003).

Plaintiff concedes that she has enjoyed the representation of counsel throughout her dispute with Hartford and that the Parties' relative levels of sophistication do not merit greater scrutiny. Document No. 19, p. 12. Furthermore, Gallaher does not contest—and the record does not suggest—either that the information relevant to her case was equally available to all Parties or that Hartford's current status necessitates less deference.[3] *Id.* The Court will therefore not increase the standard of review based on these factors.

*Pinto*'s list is not exhaustive, however. *Kosiba v. Merck & Co.*, 384 F.3d 58, 64 (3d Cir. 2004). Procedural anomalies during the claims process can also engender less deferential review. *Pinto*, 214 F.3d at 395. "The burden of proof is on the claimant to show that a heightened standard of review is warranted in a particular case." *Marciniak v. Prudential Fin. Ins. Co. of Am.*, 184 Fed. Appx. 266, 268 (3d Cir. 2006) (nonprecedential opinion (citing *Schlegel v. Life Ins. Co. of N. Am.*, 269 F. Supp. 2d 612, 617 (E.D. Pa. 2003))). Defendant therefore asserts that three other considerations warrant greater scrutiny of Defendant's action: "that [Hartford's] decision making [was] inconsistent, that [Hartford] relied upon the opinion of physician's [sic] hired to review records over those of the treating physician's

---

[3] According to Defendant, because there is no evidence that it is in any financial trouble, the Court should not raise the level of review based on Hartford's current status. Document No. 17, p. 13.

12

[sic] and that [Hartford] either ignored medical evidence or excerpted portions of it out of context."
Document No. 19, p. 13.

## 1.      Preference for Reviewing Physicians

"[P]lan administrators are not obliged to accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003). Unless a benefits plan specifies otherwise, "reliance on the review of non-treating physicians is not a procedural abnormality that demands a heightened level of scrutiny." *Sweeney v. Std. Ins. Co.*, 276 F. Supp. 2d 388, 396 (E.D. Pa. 2003) (citation omitted). Because there is no indication that Defendant was obligated to defer to Gallaher's treating physicians, its use of independent medical examiners offers no reason for a more stringent review. As a corollary, the mere fact that the plan administrator's independent medical examiners subsequently disagreed with the claimant's treating physician does not by itself indicate bad faith. *Work v. Hartford Life & Accident Ins. Co.*, No. 04-2565, 2005 U.S. Dist. LEXIS 28139, at *44 (E.D. Pa. Nov. 15, 2005) ("[A]ny greater weight that Hartford could have accorded to its reviewing physicians over [claimant's] treating physicians would not raise the level of scrutiny.").

## 2.      Selective Review

Where a plan administrator ignores medical records or excerpts them out of context, however, courts should further heighten the standard of review. *Petroff v. Verizon N., Inc.*, No. 02-318, 2004 U.S. Dist. LEXIS 8138, at *36 (W.D. Pa. May 4, 2004). For instance, in *Petroff*, the plan administrator misconstrued the conclusion that claimant could only sit *intermittently* for eight hours to mean she could sit *continuously* for eight hours. *Id.* The defendant's medical reviewers also ignored evidence of pain

13

and discomfort, disregarded doctors' notes, and rejected without explanation conclusions of the claimant's treating physicians. *Id.* at **16-40. Similar cases reveal equally egregious misinterpretation and selectivity. *See also Porter v. Broadspire*, No. 05-1684, 2007 U.S. Dist. LEXIS 18576 (W.D. Pa. Mar. 15, 2007) (raising the standard of review where defendant ignored highly relevant statements in the treating physician's analysis). More subtle procedural anomalies might occur when a plan administrator emphasizes one type of evidence to the exclusion of another. *Work*, 2005 U.S. Dist. LEXIS 28139 at *45.

In this case, Gallaher's primary care provider, Dr. Shoenthal, provided three relevant assessments of Plaintiff's capabilities. First are the two PSCD/PCF's, indicating that, as of September 2004, Plaintiff had no capacity for the repetitive use of her feet; could not lift, carry, push or pull more than ten pounds; and could only sit for an hour at a time, stand or walk for less than an hour at a time, and drive for two hours at a time. Document No. 18-5, pp. 11-14. Second is the July 2005 deposition, during which Dr. Shoenthal described Gallaher's capabilities:

> **A:** Sedentary work could be carried out based on the fact that she's not to lift more than ten pounds. Sedentary work on the other hand would be hard to be carried out because of the continuing pain while sitting. She could not sit more than an hour at a time. . . .
>
> **Q:** Okay. Even when she was doing any of these work—would she have pain either sitting, standing, bending anything like that even if she was allowed to have breaks by her employer?
>
> **A:** Yes, pain would continue.
>
> . . . .
>
> **Q:** As for standing and walking, what would be your opinion even with normal breaks for an eight hours, how long could she stand or walk within a normal job in the normal course of actual employment?
>
> **A:** One hour or less for each.
>
> **Q:** Would you also limit her as to any pushing, pulling type of activity?
>
> **A:** The same ten pound limit.

14

Document No. 18-3, pp. 38-40. Based on this evidence, Plaintiff argues that the cancellation of her long-term benefits evinces a selective review of the medical record and justifies less deference toward Defendant's ultimate decision. Document No. 19, p. 14.

The evidence in Defendant's favor includes the two independent medical reviews that it contracted: the Popovich Report and the Glick Report. Dr. Popovich's ultimate conclusion—that Gallaher was capable of working "in a mainly sedentary capacity with the restrictions that she not lift, push or pull more than 10 pounds and have the ability to change positions as necessary for comfort"—very closely traces Dr. Shoenthal's later deposition testimony. *Compare* Document No. 18-5, p. 6 *with* Document No. 18-3, pp. 38-40. Dr. Popovich, however, disagreed with Dr. Shoenthal's opinion that Plaintiff required limitations on the number of hours she could work in a day and on the repetitive use of her feet. Document No. 18-5, p. 6. Although Dr. Popovich faxed Dr. Shoenthal a summary of their conversation for Dr. Shoenthal's approval, he apparently submitted his report to Hartford without waiting for Dr. Shoenthal's corrections: The fax requesting corrections within five days is dated February 9, 2005, but the Popovich Report itself is dated February 10, 2005.

Consistent with Dr. Popovich's findings, the Glick Report, which considered Dr. Shoenthal's deposition testimony, concluded that Gallaher

> is not precluded from full-time work in a modified, primarily seated sedentary position. She should have the opportunity to arise from the seated position and briefly stretch and relieve stiffness every hour or so as the need arises. She should not be expected to stand and walk for more than 10 to 15 minutes at a time and should not engage in bending, stooping, crawling or stair climbing. She has a 10 lb. occasional lift/push/pull/carry limitation.

Document No. 18-2, p. 29. Although Dr. Glick read Dr. Shoenthal's deposition transcript, he does not

indicate having reviewed the September 2004 PSCD/PCF. *Id.* at 26, 28. Nor did Dr. Glick have access to the Popovich Report, although he did read Hartford's summary of Dr. Popovich's findings. *Id.* at 27.

Using Gallaher's capabilities as described in the Popovich report, Hartford conducted a second EAR in February 2005. Document No. 18-4, pp. 22-43. Because this EAR found Gallaher capable of performing certain occupations, Hartford mailed Plaintiff a letter summarizing its review of her medical history and confirming the discontinuance of her long-term benefits. Document No. 18-2, pp. 6-11. Based largely on the Glick Report, Hartford subsequently denied Gallaher's appeal of that decision in a letter dated September 22, 2005. Document No. 18-2, pp. 2-5.

This review of the how Defendant processed Gallaher's claim for benefits reveals considerable selectivity. By emphasizing only those activities that Plaintiff could perform and ignoring those she could not—such as sitting and walking for certain lengths of time—Dr. Popovich filtered evidence of disability out of Dr. Shoenthal's opinions. This slant subsequently affected each step in the claims process; Gallaher's physical limitations, as described in the 2004 PSCD/PCF, were not calculated into Hartford's February 2005 EAR, its termination letter, or the Glick Report. Every subsequent review of Plaintiff's medical condition emphasized Dr. Popovich's conclusions without noting that Dr. Popovich failed to note those limitations that Dr. Shoenthal had previously identified, failed to explain his disagreement with Dr. Shoenthal, and failed to adequately corroborate his consultation with Dr. Shoenthal. The effect of this dilution can best be seen in the Glick Report, where Dr. Glick notes a "report from Hartford Life summarizing Dr. Popovich's review [stating] that [Dr. Shoenthal] did not identify a limitation with respect to the number of hours that the claimant was capable of working per

16

day or a limitation with respect to repetitive use of her feet in a sedentary circumstance." Document

No. 18-2, p. 27. In reality, of course, Dr. Shoenthal had identified just those limitations in his 2004

PSCD/PCF. Document No. 18-5, pp. 13-14. This selectivity easily justifies a more stringent standard

of review.

### 3.    Inconsistent Treatment

Plaintiff further argues that less deference is appropriate because her condition only worsened

between the time when Hartford awarded her long-term benefits and subsequently discontinued them.

Document No. 19, p. 14. In support, Plaintiff contrasts Dr. Shoenthal's two PSCD/PCFs. The first is

summarized in Hartford's August 2002 EAR, which identifies the following limitations: "Sit/Drive: 6

hours; Stand/Walk: 3 hours; Lift up to 10 lbs; climbing, balancing, stooping, kneeling, crouching,

crawling **Occasional**; reaching, handling, fingering: **Frequent**; Talking, hearing, tasting, etc: **Constant**

as A.P. did not place any restrictions in these areas." Document No. 19-2, p 1. In his second

PSCD/PCF, Dr. Shoenthal indicated substantially stricter limitations:

| Activity | # Hours at a Time | Total # Hours/Day | In 8 hour workday |
| --- | --- | --- | --- |
| Sit | 1 | 1 | 1 |
| Stand | less than 1 | less than 1 | less than 1 |
| Walk | less than 1 | less than 1 | less than 1 |
| Drive | 2 | 2 | 2 |

Document No. 18-5, p. 13. Plaintiff argues that because of the apparent decline in her capabilities

between 2002 and 2004, the decision to discontinue her benefits must have been made in bad faith.

In response, Hartford argues that it has an obligation to continuously assess whether claimants

meet the qualifying standards for benefits. Although Gallaher was disabled under the Plan in 2002,

according to Defendant, her failure to provide evidence of ongoing disability in 2005 legitimized the

17

discontinuation of her benefits. Document No. 21, pp. 2-5.

The denial of previously-awarded disability benefits is particularly suspicious when no additional medical information has come to light. *Pinto*, 214 F.3d at 393. In *Pinto*, the insurer initially accepted plaintiff's claim for benefits, but subsequently reversed that determination when it learned that the Social Security Administration had concluded that plaintiff was not disabled. *Id.* Because there was no evidence that plaintiff's condition had changed since defendant initially granted disability benefits, this inconsistent treatment of identical facts pushed the standard of review toward "the far end of the arbitrary and capricious 'range.'" *Id.* at 394.

In this case, however, Defendant was reviewing more than just Dr. Shoenthal's PSCD/PCFs. In the time since Hartford continued Gallaher's long-term benefits in September 2002 (Document No. 18-2, p. 16), Dr. Epstein concluded that Gallaher "should be able to do a desk job." Document No. 18-3, p. 17. Moreover, regardless of any flaws in the Popovich Report, Hartford could justifiably rely on the conclusion of its independent medical examiner that Gallaher could "work in a mainly sedentary capacity." Document No. 18-5, p. 6. Lastly, because Defendant's EARs evidently consider national economic conditions, Gallaher's eligibility for certain benefits may have been influenced by considerations other than her health. Document No. 19-2, p. 1; Document No. 18-4, p. 23. Thus, the discontinuation of Gallaher's long-term disability benefits, though an obvious reversal of her previous eligibility, is not grounds for a more rigorous standard of review.

In summary, the inherent structural conflict of interest that Defendant incurs as a result of both funding and administering the Plan raises the standard of review to that of heightened arbitrary and capricious. Additionally, greater scrutiny is necessary to compensate for the selective review of

18

Plaintiff's medical records on which Defendant based its decision to terminate Gallaher's benefits. Though no easily-articulated measure is possible, the Court finds it sufficient to conclude that on the sliding scale that represents the possible standards of review in § 1132 cases, the decision at issue in this case deserves less deference than ordinary heightened arbitrary and capricious review would normally require. Given that the general level of review remains somewhat deferential, however, the Court will affirm Hartford's decision if it is supported by substantial evidence.

## B. The Denial of Gallaher's Benefits

Even with this more stringent level of review, however, the Court cannot conclude that a reasonable fact finder would consider the discontinuation of Gallaher's benefits arbitrary and capricious. Plaintiff argues that "Hartford selectively relied on certain evidence unfavorable to [her] claim while ignoring substantial information in the record that supports [her] claim for benefits." Document No. 19, p. 15. Gallaher alleges that because Defendant selectively reviewed the evidence, failed to consider evidence of her subjective pain, and did not explain the rejection of Dr. Shoenthal's conclusions, the termination of her benefits contravened ERISA's mandate. *Id.* at 15-17. In support of her position, Plaintiff cites to various medical records: two MRIs showing a right L4-S1 disc protrusion; physical exams finding tenderness and a limited range of motion; surgical records of chondromalacia medial femoral condyle; knee reconstruction surgery; and the diagnosis of degenerative conditions. Document No. 19, pp. 16-17.

The question is not, however, whether the claimant's medical records provide evidence of limited capabilities or a reason to conclude that she is disabled. The Court must instead ask whether Hartford abused its discretion when it discontinued Gallaher's benefits; sufficient evidence that Plaintiff

19

was capable of working in some capacity will necessitate judgment in Defendant's favor. The Court's review is limited to "that evidence that was before the administrator when [it] made the decision being reviewed." *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 440 (3d Cir. 1997). The record now before the Court does not evince the necessary caprice in either Hartford's initial termination of Gallaher's long-term disability benefits or its subsequent rejection of Plaintiff's appeal.

### 1.    The Initial Termination of Benefits

In terminating Plaintiff's benefits, Hartford primarily considered Dr. Shoenthal's second PSCD/PCF, the Popovich Report, and the February 2005 EAR. Document No. 18-2, p. 8. The PSCD/PCF was based on an examination of Plaintiff and concluded that Gallaher's ability to lift, carry, push, or pull was limited to ten pounds; that Gallaher was unable to climb, balance, stoop, kneel, crouch, or crawl; that she could only occasionally reach above her shoulders or below her waist, handle, finger, or feel; that the could not repetitively use either foot; and that her performance of certain activities was limited to the following extent:

| Activity | # Hours at a Time | Total # Hours/Day | In 8 hour workday |
|----------|-------------------|-------------------|-------------------|
| Sit      | 1                 | 1                 | 1                 |
| Stand    | less than 1       | less than 1       | less than 1       |
| Walk     | less than 1       | less than 1       | less than 1       |
| Drive    | 2                 | 2                 | 2                 |

Document No. 18-5, pp. 13-14. Dr. Shoenthal also found that Plaintiff did not require any environmental restrictions, but that her physical restrictions were not likely to improve. *Id.* at 14. Where the PSCD/PCF form asked for the date on which Gallaher could return to work, Dr. Shoenthal's response is illegible; he left blank the follow-up question regarding whether any return would be subject to the enumerated restrictions. *Id.*

The Court is not without some skepticism regarding the probity of Dr. Shoenthal's second PSCD/PCF. Assigning the same numbers for each temporal category suggests some degree of inattention and raises certain internal inconsistencies. For example, if Gallaher is able to sit for a total of one hour each day, it makes little sense that she's able to drive for two hours at a time. However, the Court must draw reasonable inferences in Plaintiff's favor and avoid weighing the value of evidence. The second PSCD/PCF thus supports any contention that Plaintiff's treating physician found Gallaher's physical capabilities substantially limited.

In contrast to Dr. Shoenthal, Dr. Popovich did not personally examine Gallaher but did conduct an extensive review of Plaintiff's medical history and considered reports from several doctors. For instance, with regard to Plaintiff's knee problems, Dr. Popovich considered the conclusions of Dr. Cooper and Dr. Port that Gallaher could perform sedentary work. Document No. 18-5, pp. 4, 20, 25. Dr. Popovich was also aware of the back problems for which Dr. Shoenthal referred Gallaher to JSMI. Although the Popovich Report does not mention JSMI's March 1, 2002, analysis, it does consider the results of the March 12, 2002, MRI performed on Gallaher's spine, as well as Dr. Shoenthal's second PSCD/PCF. *Id.* at 5, 18.

As already mentioned, Dr. Popovich also referred to a personal consultation with Dr. Shoenthal: "[Dr. Shoenthal] stated that [Gallaher] did not require any restrictions with respect to migraine headaches and that in his opinion she is capable of mainly sedentary work with the restriction that she not lift, push or pull more than 10 pounds." *Id.* at 5. To confirm his understanding of their conversation, Dr. Popovich faxed Dr. Shoenthal this summary on February 9: in which he wrote Dr. Shoenthal the following:

21

You stated that Ms. Gallaher had chronic aches and pains particularly involving her back, legs and knees. You stated that she also had migraine headaches but did not require any restrictions on that basis. You indicated that in your opinion Ms. Gallaher was capable of working in a mainly sedentary capacity with the restriction that she lift no more than 10 pounds. You did not identify any specific objective physical examination findings indicative of an inability on the part of Ms. Gallaher to function at this level.

Please make any corrections or additions to this summary that you find necessary. If I do not hear from you within five business days via fax . . . I will assume that I have accurately summarized our conversation.

Document No. 18-5, p. 8. The date of the Popovich Report—February 10—suggests that Dr. Popovich did not wait the full five days before submitting his report. There is nothing in the record to indicate whether Dr. Shoenthal ever responded to the February 9 fax.[4]

Basing his conclusions on the medical records and his consultation with Dr. Shoenthal, Dr Popovich found that Gallaher's "primary disabling condition is osteoarthritis of her knees." *Id.* at 6. Dr. Popovich stated that he is "generally in agreement with the restrictions/limitations" indicated in Dr. Shoenthal's second PSCD/PCF. Although he but found "[n]o limitations . . . with respect to the upper extremities or the spine," Dr. Popovich did state that Plaintiff's physical limitations are in part "based upon her history of back pain with lumbar disc disease." *Id.* at 6. Dr. Popovich disagreed with Dr. Shoenthal that there was a "limitation with respect to the number of hours that Ms. Gallaher is capable of working per day or a limitation with respect to repetitive use of her feet in a sedentary circumstance." *Id.* at 5, 6. The Popovich Report ultimately concludes that Gallaher could "work in a mainly sedentary capacity with the restrictions that she not lift, push or pull more than 10 pounds and have the ability to

---

[4] Defendant does state in its Reply brief that "Dr. Shoenthal did not make any corrections or additions" to the February 9 fax. Document No. 21, p. 4. There is no evidence supporting this assertion, however, and even if there was, it would be somewhat dubious in this instance to conflate nonresponsiveness with agreement.

change positions as necessary for comfort." *Id.* at 6.

The Court cannot assume that the Popovich Report accurately recounts Dr. Shoenthal's opinions. However, Hartford could reasonably rely on Dr. Popovich's representation that his report incorporated the conclusions of Gallaher's treating physician. Even if some procedural anomaly raises the level of scrutiny, it does not necessarily make Hartford's decision arbitrary and capricious. Although the Popovich Report effectively removed from subsequent consideration the limitations described in Dr. Shoenthal's second PSCD/PCF, it nonetheless purported to reflect some consensus between a treating physician and an independent medical examiner that Plaintiff was capable of sedentary work—a consensus that every doctor who examined Gallaher's knees apparently joined.

Equally damaging to Plaintiff's case is the lack of evidence that she is actually disabled. Certainly, there is ample indication that Gallaher suffers from serious medical conditions, and the record clearly supports any argument that her physical capabilities are limited. However, none of the evidence available in February 2005—including Dr. Shoenthals' second PSCD/PCF—states that Gallaher was incapable of performing sedentary work. Rather, the records suggest that every doctor who treated Gallaher or reviewed her medical file opined that she could work if given appropriate accommodations. Although each doctor also identified certain limitations to Plaintiff's physical abilities, it appears that none thought them so severe as to constitute a total disability.

Although the Popovich Report omitted certain aspects of Dr. Shoenthal's second PSCD/PCF, thus making all subsequent reviews selective, Gallaher has not shown how that omission makes Hartford's decision arbitrary and capricious. Dr. Shoenthal's more restrictive physical limitations do not necessarily constitute total disability, and therefore do not contradict the report that Dr. Shoenthal

23

considered Plaintiff capable of sedentary work. Defendant's review of Gallaher's medical records was selective only to the extent that it omitted certain aspects of the 2004 PSCD/PCF. But because the decision to terminate Plaintiff's long-term benefits would not have been arbitrary or capricious even had Hartford considered that document in full, there is no genuine issue of material doubt suitable for the finder of fact.

## 2. Gallaher's Appeal

Nor could a reasonable fact finder determine that upholding the termination was arbitrary or capricious. In addition to the bases for its original termination, Hartford's review of Plaintiff's appeal also considered the Glick Report, various MRI reports, the May 2005 analyses of Dr. Osgood and Dr. Ward, and the April 2003 Epstein Report. Document No. 18-2, p. 2. Additionally, Plaintiff submitted as part of her appeal the transcript of Dr. Shoenthal's July 2006 deposition.

While Dr. Osgood and Dr. Ward both reviewed Plaintiff's back problems and assessed her physical limitations, neither opined on her work capabilities. Document No. 18-4, pp. 8-10. The MRI reports similarly detail Gallaher's physical ailments without applying them to her general functionality. Again, there is no doubt that Plaintiff suffers from adverse physical conditions, but assessing how those conditions affected her ability to work was the province of the Plan administrator. In judging Plaintiff's fitness, Hartford therefore relied on the opinions of those physicians who treated Gallaher or reviewed the medical records. First was Dr. Shoenthal's deposition transcript; second was the independent medical review that Dr. Glick performed.

Plaintiff places great emphasis on Dr. Shoenthal's testimony that Gallaher would always experience pain, which would make sedentary work difficult and would prevent Gallaher from sitting

24

for more than an hour at a time. Document No. 18-3, pp. 2-3. But Dr. Shoenthal never testified that Plaintiff could not perform sedentary work. Instead, he stated at deposition only that he did not "know of any job where they let you get up and roam around every hour to help the back pain." *Id.* at 3. His deposition thus does little to alter the general consensus among Dr. Popovich, Dr. Glick, and Dr. Shoenthal that Plaintiff could perform some sedentary work if given appropriate accommodations. Any discrepancies in their conclusions are apparently the product of nonmedical opinions. Whereas Dr. Shoenthal apparently did not "know of any job where they let you get up and roam around every hour to help the back pain," Dr. Glick stated his belief that "there are many seated sedentary jobs which are consistent with the[] limitations" on Gallaher's abilities. Document No. 18-3, p. 39; Document No. 18-2, p. 29.

Furthermore, Dr. Glick had before him the Epstein Report, which apparently reflects a normal neurological examination. Although often quite illegible, the Report does clearly state that Gallaher "should be able to do a desk job, even if she has chronic pain, she can still walk." Dr. Epstein suggests that Plaintiff's only limitation is the inability to perform "a job that requires heavy lifting" and finds that Gallaher cannot lift more than twenty pounds. Document No. 18-3, pp. 17, 24. Dr. Shoenthal testified that, although he would increase the weight restriction to ten pounds, he otherwise concurred with the opinions expressed in the Epstein Report. Document No, 18-4, p. 2. The evidence submitted to Hartford during Gallaher's appeal therefore reinforces Plaintiff's physical limitations, but, more importantly, provides direct evidence that Dr. Shoenthal agreed Gallaher was capable of certain types of sedentary employment. Given the strength of the apparent consensus to that effect, Defendant did not act arbitrarily or capriciously in denying Gallaher's appeal.

25

## IV. CONCLUSION

Although Defendant's inherent structural conflict of interest, in addition to certain procedural anomalies with regard to the administration of Plaintiff's claim for disability benefits, justify the heightened arbitrary and capricious standard of review in this case, the Court nonetheless determines that no reasonable fact finder could conclude that Hartford incurred civil liability when it terminated Gallaher's benefits and denied her appeal. For the foregoing reasons, the Court will therefore grant Defendant's Motion for Summary Judgment in its entirety.

An appropriate order follows.

**AND NOW**, this 29th day of May, 2007, this matter coming before the Court on Defendant Hartford Life and Accident Insurance Company's Motion for Summary Judgment (Document No. 16), **IT IS HEREBY ORDERED THAT** the Motion is **GRANTED**. Accordingly, the Clerk of Court shall enter judgment in favor of Defendant and against Plaintiff Virginia Gallaher.

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**

**Cc:     All counsel of record**

26